## Case No. 2,404.

### CAREY v. WASHINGTON.

[5 Cranch, C. C. 13.] [1]

Circuit Court, District of Columbia. Nov. Term, 1836.

MUNICIPAL CORPORATIONS—WASHINGTON—POWERS—LICENSES.

1. The corporation of Washington has no power to prohibit free colored persons from selling perfumery.

2. Quaere, whether they have authority to require any person to take a license to sell perfumery.

3. The corporation has no power to restrain or prohibit any person from the full exercise of all his rights, under the general law of the land, unless the power so to restrain or prohibit is expressly given by the charter, or necessarily results from some given express power.

[Cited in Washington v. Casanave, Case No. 17,225.]

Appeal from the judgment of a justice of the peace for the county of Washington.

The warrant, dated on the 23d, and returnable on the 24th of November, 1836, was to arrest the defendant, etc. [Isaac N. Carey], to answer to the mayor, board of aldermen and board of common council of the city of Washington in a plea that he render unto them the full sum of fifty dollars which he owes and unjustly detains, "for that he the said Isaac N. Carey, being a free negro, did, on the 22d day of November, 1836, sell perfumery in the city of Washington, without first having obtained a license therefor, contrary to the act or acts of said mayor, etc., on that subject made and provided."

Mr. Dandridge and W. L. Brent for the appellant, and Bradley for the appellees, admitted the following facts:

That the appellant was residing in the city of Washington before the 29th of October, 1836, and had complied with the requisitions of the by-law of 1827, respecting the admission and residence of free colored persons. That he kept and sold perfumery, and paid for a license therefor, previous to the said 29th of October, 1836, and that his said license expired on the first Monday of November, 1836. That he applied to the mayor of Washington for a renewal of his said license on or before that day, who refused to grant such license under the ordinance of the 29th of October, 1836. That he continued to keep and sell perfumery after the expiration of his said license. The justice rendered judgment for a fine of 25 dollars, from which judgment the defendant appealed. This fine was imposed under the by-law of the 28th of October, 1831, entitled "An act providing additional revenues for the corporation," by the first section of which it is enacted that the taxes on cer-

tain licenses therein enumerated should be fixed at certain rates, and among others the following: "On each license to sell hardware, medicines, perfumery, jewelry, and watches, twenty dollars." And by the third section it is enacted, "That if any person or persons shall sell, barter or keep, as in the first section of this act enumerated, without first obtaining a license therefor, he, she, or they shall forfeit and pay, for each and every offense, a fine not less than ten nor more than fifty dollars, to be recovered and disposed of as are other fines for violations of the laws of the corporation." The 3d section of the by-law of the 29th of October, 1836, under which the mayor refused to grant a license to the appellant to sell perfumery, is in these words, "It shall not be lawful for the mayor to grant a license, for any purpose whatever, to any free negro or mulatto, except licenses to drive carts, drays, hackney-carriages, or wagons."

W. L. Brent and Mr. Dandridge, for appellant.

Mr. Bradley, for appellees.

CRANCH, Chief Judge, delivered the following opinion (MORSELL, Circuit Judge, observing that he concurred only in that part of it which denied the power of the corporation to prohibit free colored persons from selling perfumery):

This action is founded on the by-law of the 28th of October, 1831, entitled, "An act providing additional revenues for the corporation." This by-law is very badly expressed: but we can understand the intention of the corporation to be, to raise a revenue by granting licenses to sell, or by imposing fines for selling, without license, the articles, for the sale of which licenses were to be granted. But it is said that the defendant tendered the price or tax, for a license to sell perfumery, and demanded a license, from the mayor, which he refused to grant, because he was forbidden by the by-law of the 29th of October, 1836, § 3, to grant such a license to a colored person. The defendant's counsel contend that this by-law is void, because the corporation had no power to forbid the mayor to grant the license; nor to discriminate between white and colored persons; nor to forbid any free colored person to carry on the trade of selling perfumery, which was a trade lawful to white persons. The third section of the by-law of the 29th of October, 1836, says, "It shall not be lawful for the mayor to grant a license, for any purpose whatsoever, to any free negro or mulatto, except licenses to drive carts, drays, hackney-carriages, or wagons." This clause, taken in connection with the act of the 28th of October, 1831, requiring a license, and imposing a penalty of from 10 to 50 dollars for selling without license, amounts, in effect, to a prohibition to free

colored persons to carry on the business of selling any of the articles, for the sale of which a license is required by the by-law of the 28th of October, 1831. The by-laws must not be repugnant to the general law of the land, further than such by-laws are justified by the express provisions of the charter.

By the general law of the land, free colored persons have a right to exercise any lawful trade or calling which white persons may exercise: a by-law forbidding them to do so, is contrary to the general laws of the land, and void, unless authorized by the charter. The selling of perfumery is a lawful business, or occupation. No express power is given to the corporation, by the charter, to prohibit or restrain it, or to license it, or to require a license to use or pursue it. The exercise of it is not, in itself, a nuisance. The corporation has no authority, under the power "to lay and collect taxes" to require the person exercising it, to obtain a license to do so; for the power, given by the charter, to lay and collect taxes, is only "to lay and collect taxes on real and personal property." The licenses, which the corporation may require, are expressly designated; and are confined to "auctions, retailers, ordinaries and taverns, hackney-carriages, wagons, carts, and drays, pawn-brokers, venders of lottery tickets, money changers, hawkers and peddlers, and theatrical and other shows and amusements." Their express power of restraining and prohibiting, is confined to tippling-houses, lotteries, and all kinds of gaming, and nightly and other disorderly meetings of slaves, free negroes, and mulattoes. They have also an implied power to restrain or prohibit whatever may be inconsistent with such regulations as may be necessary to prevent the introduction of contagious diseases, and for the preservation of the health of the city; whatever may be a common nuisance; whatever may injure the navigation of the Potomac and Anacostia rivers adjoining the city; and, in short, whatever may be inconsistent with the regulations which they have any express power to make. But the right to sell perfumery is not real or personal property which can be taxed as such. It is not within the list of licenses, authorized by the charter, nor is it one of the matters which may be restrained or prohibited by any express provision of the charter; nor can it injure the health of the city, or be in itself a nuisance. I think, therefore, that it cannot be prohibited.

But it is said that colored persons are a distinct class, not entitled to equal rights with the white population, and that they may be prohibited, although the whites may not. Such is not the general law of the land in regard to a right of this kind; the right to get a living by an honest, lawful, and harmless occupation. The corporation cannot make it the law of this city, unless they are authorized to do so by the charter; and I cannot find, in the charter, any such authority. I think, therefore, that neither the act of the 28th of October, 1831, nor the act of the 29th of October, 1836, so far as they prohibit or require a license for the selling of perfumery, is warranted by the charter. But if the by-law of the 28th of October, 1831, should be justified and supported by the clause of the charter authorizing the corporation "to lay and collect taxes upon the real and personal property within the said city," so far as it requires a license to be paid for, as a means of raising a revenue, yet a by-law to prohibit a certain class of citizens from exercising a lawful business or occupation, cannot be justified by the same clause of the charter; for the prohibition is not a means of raising a revenue.

The cases, in which licenses may be required, under the charter have been already enumerated, and are cases in which the public is concerned in the character of the person to be licensed; and therefore a discretion is given to the corporation to grant or refuse the license. The drivers of hackney-carriages, carts, and drays are a kind of public servants, or common carriers, in whose honesty and fidelity the public is interested, as they have the carriage of property to a large amount, and must, in a great measure, be trusted; and they derive a credit and character from their license. In the other enumerated cases the necessity or expedience of giving a discretion to the corporation is sufficiently obvious. But the corporation has no power to prohibit or restrain the exercise of a common right, unless that power be expressly given, or be necessary to the exercise of some expressly given power. But it has been suggested that the corporation derives its power, to tax a person who sells perfumery, from the clause of the charter, which authorizes them "to provide for licensing, taxing, and regulating auctions, retailers, ordinaries, and taverns, hackney-carriages," etc. The person who sells perfumery, it is said, is a "retailer," and therefore liable to be taxed and regulated, and to be prohibited from selling without a license. The word, "retailers," in the charter, as I apprehend, means, exclusively, retailers of "wine, rum, brandy, whiskey, or other distilled spirituous liquor, strong beer, or cider." These were the only retailers known in the Maryland statutes at the time of the separation of this part of the district from that state, to whom a license could be granted. They were always, colloquially, and in various statutes, called "retailers," without designating them as retailers of liquors. The licenses were granted by the county courts, and after the separation they were granted by this court, until 1804, when an amendment to the charter of. Washington vested the power of granting them, within the city, exclusively to the corporation. The terms, "retailers," and "retail licenses," were as fa-

miliar here as they had been for many years in Maryland, and always applicable to retailers of liquors only.

By the Maryland act of 1784. c. 24, it was enacted, "That no person shall retail any wine, rum, brandy, whiskey, or other distilled spirituous liquor, strong beer or cider, on the western shore, without a license for that purpose obtained; and any person selling any of the articles aforesaid, under the quantity of ten gallons, shall be deemed a retailer." Here we have a clear, statutory definition of the word, "retailer." It means a person selling wine, rum, brandy, whiskey, or other distilled spirituous liquor, under the quantity of ten gallons. After having given this definition of the word "retailer," the statute, and subsequent statutes of Maryland, use the word without the additional words, "of liquors," but always in the sense of the definition given in that statute. Thus in the 26th section of the same statute of 1784, it is enacted, "that if any retailer shall keep a disorderly house," etc., the court "may suppress such retailer." By the 27th section, "that every licensed retailer shall sell only by sealed measures;" "and it shall be lawful for any justice or constable, on complaint, to enter into the house of any retailer," etc. By the 30th section, "that any person not having before had a license to retail, may, at any other than the August court, have license granted," etc. By the 31st section, "that every person applying for a license to retail, shall, at the time of granting the same, enter into recognizance," etc. By the act of 1799, c. 80, § 4, the state's agent is authorized to superintend the collection of all moneys due for "forfeited recognizances, ordinary retailers, and marriage licenses." By the act of 1799, c. 85, § 2, it is enacted, "that the mayor's court of the corporation of Georgetown, shall have the sole and exclusive power of granting ordinary and retailer's licenses within the jurisdiction of the corporation." Such being the exclusive use of the word, "retailers," in Maryland, and in this county, congress, in 1802, granted a charter to the city of Washington, in which, among other powers, they gave the corporation the power "to pass by-laws and ordinances, to provide for licensing and regulating auctions, retailers of liquors, hackney-carriages, wagons, carts and drays, and pawnbrokers within the city." This charter did not give the corporation power to license ordinary-keepers. In February, 1804, the corporation obtained an amendment of the charter, enlarging their powers, and, among others, giving them power "to license and regulate, exclusively, hackney-coaches, ordinary-keepers, retailers and ferries." Under this amended charter, the corporation passed a by-law on the 19th of July, 1804, entitled, "An act requiring annual licenses to be taken by ordinary or tavern keepers, retailers, and hawkers and peddlers." By the 3d section of this by-law it

is enacted, "that all retailers of wines or spirituous liquors, other than tavern-keepers, who shall sell the same in smaller quantities than ten gallons, shall take out an annual license therefor, and for which license they shall pay, for the use of the city, the sum of eight dollars, which license shall authorize the selling of any such quantity, not less than one pint; and provided the same is not drank in the house or store of the person having such license." By the 4th section, it is enacted, that every person, so obtaining a retail license, shall give bond, etc. Here the corporation, in the title of the by-law, have used the word, "retailers," as it was used in their new charter, without the words, "of liquors," which was annexed to it in the charter of 1802; and in the body of the by-law they show what they mean by the word, "retailers," namely, those, other than tavern-keepers, who sell wines or spirituous liquors in smaller quantities than ten gallons, and not less than one pint; which is substantially the same definition as that given in the Maryland statute of 1784. And a license to do this the by-law calls "a retail license." The same by-law also authorizes a license for selling liquors in any house, other than a tavern, in smaller quantities than a pint. This is not, in the by-law, called retailing, nor the license a retail license; the word, "retailing," having acquired a technical meaning under the Maryland statute which had appropriaed it to the selling of liquors under ten gallons. This license to sell less than a pint was vulgarly called a license to sell by the small.

In the by-law of October 30, 1810, § 5, it is enacted "that all licenses for hackney-carriages, theatrical, and other public amusements; to ordinary or tavern keepers, retailers. and hawkers. peddlers and auctioneers, shall be paid for and issued, and the taxes on slaves of non-residents, and on dogs, shall be paid and entered as heretofore directed by the several acts respecting the said objects." Here again, the word, "retailers," is applicable only to retailers of wines and other liquors; for no license had ever been granted to any other description of retailers. This was six years after the power given to the corporation to license and regulate "retailers." There is no expression in the by-law limiting it to retailers of liquors. If the corporation had solicited the amendment of the charter, striking out the words, "of liquors," appended to the word "retailers," in the first charter, in order that they might license and regulate retailers of all sorts of merchandise; or if they had supposed that the omission of those words, in the amended charter, had given them that power, it is not to be believed that they would have omitted to exercise it for a period of twenty-two years, namely, from 1804 to 1826, when, for the first time, on the 7th of November, they passed a by-law by the first section of which the mayor is authorized "to

issue licenses for the purposes following, on the terms and conditions hereinafter mentioned, to wit: Porter-cellar licenses, to keep a porter-cellar or house to sell in, or barter, porter, ale, strong beer, and cider, and to carry and deliver or sell the same in bottles in this city, on the payment of a tax for each license, at the rate of fifteen dollars per annum; and that any person or persons taking out a license for selling spirituous liquors in quantities not less than a pint, be permitted to sell porter, ale, beer, and cider, by paying annually for a license, in addition to the former license, five dollars, and to sell by wholesale or retail the following descriptions of goods other than the manufacture of the United States; as dry goods, hardware, groceries, wines, liquors, medicines, perfumery, jewelry and watches, a tax for each license at the rate of ten dollars per annum." By the grammatical construction of this section, I should suppose that no license to sell dry goods, hardware, etc., by wholesale or retail, could be granted to any but a person taking out a license for selling spirituous liquors in quantities not less than a pint. But it is probable that the person who drew the bill, intended to authorize separate licenses to be granted for the sale of each of the specified kinds of goods. If so, this was the first attempt to require license for the sale of anything but liquors by a resident of the city. There had been a by-law passed on the 24th of May, 1823, requiring non-residents to obtain license to sell any goods, wares, or merchandise. It may be observed that the by-law of the 7th of November, 1826, imposes no penalty for selling the enumerated articles or any of them, without license; but on the 12th day of December, following, that defect was intended to be remedied by a by-law, enacting, "that if any retailer, or retailers of liquors, or sellers" (not retailers,) "of goods of foreign fabric, as described in the act to which this is a supplement, shall, after the 15th day of the present month of December, carry on the business of a retailer, or seller, as aforesaid, without license as aforesaid, he, she, or they, shall, on conviction of so retailing, or selling, after the said 15th day of December, without such license or licenses, forfeit and pay for each day they may so sell, the sum of twenty dollars." Here it may also be observed that the words, "retailer," and "seller," are used in contradistinction to each other. The word, "retailer," retains its original technical meaning, and is applicable only to retailers of liquors; and the word, "seller," to the seller of foreign fabrics. It is evident also that the by-law of November 7, 1826, so far as it requires a license to sell foreign fabrics, was not framed under the power given by the charter to the corporation, to license, tax, and regulate retailers, for it expressly includes those who should sell by wholesale; and the sellers of such

fabrics are nowhere called retailers; nor could a power to license and tax retailers, in the most extensive sense of the word, authorize the corporation to license and tax wholesale dealers.

The by-law of the 28th of July, 1831, "to provide a revenue for the canal fund," declares that it shall be unlawful for any person to sell lumber, firewood, or coal, bricks, porter, ale, or beer, or to keep a livery-stable, or to traffic in slaves, within the limits of the corporation, without first obtaining a license therefor on which certain taxes are imposed. No one can suppose that this by-law is justified by the power to license and tax retailers. No other by-law was passed upon this subject until that of October 28, 1831, which is the by-law upon which this prosecution is founded. It is an act, entitled, "An act providing additional revenues for the corporation," and in the 1st section enacts, "that the taxes on certain licenses hereinafter named, shall be, and the same are hereby increased or fixed at the following rates per annum: For a license to keep a tavern," etc., "of forty rooms, one hundred dollars," etc. "On each license to sell or barter all kinds and quantities of spirituous liquors, wines, cordials, strong beer, and cider, sixty dollars. On each license to retail spirituous liquors and wines, in quantities not less than a pint, and to sell groceries, hardware, dry goods, and china, glass, and crockery ware, twenty dollars. On each license to sell hardware, medicines, perfumery, jewelry and watches, twenty dollars. For a license to keep a confectioner's shop, ten dollars. For a license to keep a confectioner's shop, with privilege to sell cordials, fermented and distilled liquors, sixty dollars. On each license to keep a porter-cellar, etc., twenty dollars. For a license to a non-resident to sell porter," etc., in the city, "fifty dollars. For a license to sell hats, boots and shoes, not manufactured in the city of Washington, twenty-five dollars; and for a license to sell the same, or either of them, in addition to any other license, ten dollars." And by the 3d section it is enacted, "that if any person or persons shall sell, barter, or keep, as in the first section of this act enumerated, without first obtaining a license therefor, he, she, or they, shall forfeit and pay, for each and every offence, a fine, of not less than ten nor more than fifty dollars, to be recovered and disposed of as are other fines for violations of the laws of this corporation." This by law, so far as it may seem to require a license to sell groceries, hardware, hats, boots, etc., does not appear to have been framed under the charter-power, to license, tax, and regulate "retailers;" for it uses the word, "retail," only once, and then only in reference to the sale of spirituous liquors and wines in quantities not less than a pint; and it requires a license to sell all these articles by wholesale.

From a consideration of the whole course of legislation upon this subject, from the year 1784, by the state of Maryland, by congress, and by the corporation of Washington, up to the present time, it seems to me very clear, that the word, "retailer," as used in the laws of Maryland, in the charter of Washington, and in the by-laws of the corporation, means, exclusively, a retailer of liquors, and has been so understood universally. But if it were not so, the defendant in this prosecution is not charged with retailing, nor with being a retailer of perfumery. He is simply charged with selling; and it does not appear that he did not sell by wholesale, in which case he cannot be punished under a power to punish retailers. Upon these grounds, I am clearly of opinion, that the power, given by the charter, to license, tax, and regulate retailers, does not authorize the corporation to license, tax, and regulate the sellers of other articles of merchandise than wine, rum, brandy, whiskey, or other distilled spirituous liquors, strong beer, or cider, or other intoxicating liquors. That under the power "to lay and collect taxes upon the real and personal property within the city;" or the power "to lay taxes on particular wards, parts, or sections of the city, for their particular local improvements;" or the power "to establish and erect hospitals or pest-houses, watch, and work houses, houses of corrrection, penitentiary, and other public buildings, and to lay and collect taxes for the expense thereof; the corporation has no authority to require, from any person, a license to use any lawful and harmless trade, calling or occupation. Whenever the corporation is expressly authorized by the charter to grant a license, it has a discretion to withhold it: but it has no authority to restrain or prohibit any person from the full exercise of all his rights, under the general law of the land, unless the power so to restrain or prohibit is expressly given by the charter, or necessarily results from some given express power. This is a rule applicable to all corporations acting under a charter; and to all bodies politic acting under a constitution. The powers not given are reserved. Although free colored persons have not the same political rights which are enjoyed by free white persons, yet they have the same civil rights, except so far as they are abridged by the general law of the land. Among those civil rights, is the right to exercise any lawful and harmless trade, business, or occupation; and if it be not a trade, business, or occupation, subjected by the charter to the control or discretion of the corporation, I think they have no power to prohibit them from using it.

Judgment reversed, without costs.

See, also, Hesketh v. Braddock, 3 Burrows, 1856.